# UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| **In re:** | ) | |
| | ) | |
| **ROSA NICHOLE RENEE JAMES,** | ) | **Case No. 17-41965-BTF7** |
| | ) | |
| Debtor. | ) | |
| **DANIEL J. CASAMATTA,** | ) | |
| **Acting United States Trustee,** | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Adv. Case No. 18-4168-CAN** |
| | ) | |
| **CASTLE LAW OFFICE OF KANSAS CITY, P.C.,** | ) | |
| a Missouri Professional Corporation, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **JASON C. AMERINE,** | ) | |
| Defendants. | ) | |
| **In re:** | ) | |
| | ) | |
| **HUZAIFAH TARIK BABIKIR,** | ) | **Case No. 17-41960-DRD7** |
| | ) | |
| Debtor. | ) | |
| **DANIEL J. CASAMATTA,** | ) | |
| **Acting United States Trustee,** | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Adv. Case No. 18-4172-CAN** |
| | ) | |
| **CASTLE LAW OFFICE OF KANSAS CITY, P.C.,** | ) | |
| a Missouri Professional Corporation, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **JASON C. AMERINE,** | ) | |
| Defendants. | ) | |

| | |
|---|---|
| In re: | ) |
| | ) |
| **ANTOINETTE MICHELLE GRANT,** | ) Case No. 17-41914-CAN7 |
| | ) |
| Debtor. | ) |
| **DANIEL J. CASAMATTA,** | ) |
| **Acting United States Trustee,** | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Adv. Case. No. 18-4194-CAN |
| | ) |
| **CASTLE LAW OFFICE OF KANSAS CITY, P.C.,** | ) |
| **a Missouri Professional Corporation,** | ) |
| | ) |
| and | ) |
| | ) |
| **JASON C. AMERINE,** | ) |
| Defendants. | ) |
| In re: | ) |
| | ) |
| **JEFFEREY SCOTT HANNAH,** | ) Case No. 17-41912-BTF7 |
| | ) |
| Debtor. | ) |
| **DANIEL J. CASAMATTA,** | ) |
| **Acting United States Trustee,** | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Adv. Case. No. 18-4196-CAN |
| | ) |
| **CASTLE LAW OFFICE OF KANSAS CITY, P.C.,** | ) |
| **a Missouri Professional Corporation,** | ) |
| | ) |
| and | ) |
| | ) |
| **JASON C. AMERINE,** | ) |
| Defendants. | ) |

2

## REPORT AND RECOMMENDATION TO THE DISTRICT COURT ON DEFENDANTS' MOTIONS TO WITHDRAW THE REFERENCE

At the heart of this matter is which court – bankruptcy or district – should decide whether the debtors' bankruptcy attorneys violated bankruptcy code provisions and applicable bankruptcy and ethical rules and should be sanctioned. The defendant attorney and his law firm argue that the bankruptcy court lacks jurisdiction and authority to decide these issues. They argue that the act of sanctioning is an exercise of criminal contempt powers, such that only the district court should decide and enter judgment in these four consolidated cases. They request that the district court use its discretion to withdraw the reference of the plaintiff United States Trustee's complaints against them. This court reports and recommends that the district court deny the defendants' motions.[1]

### *Introduction*

The relationship between consumer debtors and their bankruptcy attorneys is unique in that the bankruptcy code and rules expressly require full disclosure of fee arrangements, mandatory court review, and disallowance of fees determined to be unreasonable.[2] Congress granted this authority to the bankruptcy court in large part because of the particular vulnerability of unsophisticated, financially-strapped consumer debtors.[3]

To put these cases into context, most courts hold that bankruptcy attorney fees are treated the same way as any other dischargeable debt.[4] This means that if the attorney is not paid in

---

[1] Fed. R. Bankr. P. 5011(a). All subsequent references shall be to the federal rules of bankruptcy procedure, unless otherwise noted.

[2] 11 U.S.C. §§ 329, 330, 331, 526, 527, 528; Rules 2014, 2016. *See, e.g., In re Wright*, 591 B.R. 68, 89-90 (Bankr. N.D. Okla. 2018) (discussing duties of disclosure; imposing sanctions against attorneys for violations).

[3] *See, e.g.*, S. Rep. 95-989, found at 1978 U.S.C.C.A.N. 5787, 5826, 1978 WL 8531 at *39 ("Payments to a debtor's attorney provide serious potential for evasion of creditor protection provisions of the bankruptcy law, and serious potential for overreaching by the debtor's attorney, and should be subject to careful scrutiny.").

[4] This is a first impression issue for this court. The Eighth Circuit has not addressed whether the attorney fees incurred in preparing a bankruptcy case are dischargeable if not paid in advance. By describing the majority position this court is not stating an intent to adopt the majority position; rather, the court will make an ultimate determination after hearing the evidence and argument.

3

advance for preparing and filing the bankruptcy case, the attorney fees are deemed prepetition debts, subject to the automatic stay, and subsequently rendered uncollectible if the debtor receives a discharge.[5] Attorney fees incurred for postpetition bankruptcy services, however, may survive the discharge, assuming proper disclosure and compliance with applicable rules.[6]

As a result, most consumer bankruptcy attorneys follow one of two approaches: they get paid a reasonable flat fee up front; or they make a reasonable bifurcation of fees for pre- and postpetition services. If the fee arrangement is fully disclosed to the court, and the fees charged for both the pre- and postpetition services are reasonable, this court has generally informally allowed such bifurcation. Indeed, such treatment of fees is in part necessitated by the fact that many courts, including this one, require consumer debtors' attorneys to represent their clients throughout the entire bankruptcy case, notwithstanding if the case becomes more complicated than anticipated.[7]

The UST's theory in these cases is that attorney Jason Amerine and his law firm, Castle Law Office of Kansas City, P.C. ("Castle Law" or the "Defendants"), employed an improper and undisclosed factoring-type billing arrangement for their consumer debtor clients who were unable to prepay the attorney fees, and that that arrangement made it appear that all, or nearly all, of the fees were incurred for postpetition services when they were not. The UST alleges that, as a result of this practice, Castle Law overcharged debtors and misled the court about the nature of the fees,

---

[5] *See, e.g., In re Lawson*, 437 B.R. 609 (Bankr. E.D. Tenn. 2010) (bifurcation of fees and collection by use of post-dated checks sanctioned). The Eighth Circuit has not addressed whether the attorney fees incurred in preparing a bankruptcy case are dischargeable if not paid in advance.

[6] *See, e.g., Collier Consumer Bankruptcy Practice Guide* § 5.03[5][b] (2018) (it has become hornbook law that a debtor's attorney may be compensated for postpetition services from debtor's postpetition earnings).

[7] *See* Local Rule 2016-1.D, which requires attorneys receiving a no-look fee to agree to sign a Rights and Responsibilities Agreement requiring the attorney to represent the debtor throughout the case. The local rule also prohibits attorneys from charging additional fees for standard services absent unusual circumstances and court approval.

4

and in so doing, violated a number of bankruptcy code provisions and ethical rules.[8] Castle Law denies the allegations.

***Procedural Background***

The debtors in these cases filed voluntary petitions for chapter 7 relief in July 2017 and were represented in their filings by the defendant attorney Jason Amerine and his law firm, Castle Law. The UST filed complaints against the Defendants in each of the four cases, which were then assigned to this judge. By agreement of the parties, the four complaints have been consolidated for discovery and pre-trial proceedings.[9] Because the four cases are factually similar, and in the interest of brevity, this court will describe Debtor Rosa Nichole Renee James' case as generally representative of all four. The following recitation does not constitute findings of fact but are based on the parties' allegations in their papers.

### *Ms. James Meets with Castle Law to File Bankruptcy*

The UST alleges that, on January 31, 2017, Ms. James retained Castle Law to file a chapter 7 bankruptcy petition for a total flat fee of $1,650, comprised of $1,250 in attorney fees, $65 for a credit report fee, and $335 for the court filing fee. The UST refers to this agreement with Ms. James as the "Initial Contract." According to the UST, the Initial Contract provided that all fees Ms. James paid under the agreement were "non-refundable" and stated, essentially, that they would not file Ms. James' bankruptcy case until she had paid the $1,650 in toto, and that if she failed to do so, she forfeited all the fees paid. Ms. James made payments to Castle Law totaling $225 under

---

[8] The penalties for nondisclosure include disgorgement, civil penalties, sanctions, attorney fees, disciplinary referrals or punishment, and in extreme cases, injunctive relief such as a bar on filing cases. *See, e.g.*, *In re Reed*, 888 F.3d 930 (8th Cir. 2018).

[9] See *Order Consolidating Cases for Pre-Trial Proceedings*, ECF No. 21 in Adv. Pro. 18-4168. The parties further agreed that, unless a pleading or document relates only to a specific adversary proceeding, all pleadings and documents shall be filed in Adversary Proceeding No. 18-4168. *Id*.

the Initial Contract in the five-month period between the initial January 31 meeting and May 25, 2017.

*Castle Law Enters into the BK Billing Factoring Agreement*

The UST alleges that, in May 2017 – five months after Ms. James retained Castle Law to represent her in her bankruptcy case – Castle Law entered into a blanket Accounts Receivable Assignment Agreement (the "Factoring Agreement") with BK Billing, LLC, a company located in Utah. According to the UST, BK Billing markets itself to consumer bankruptcy attorneys as providing a means of offering "little or no money down" chapter 7 cases using a two-contract model that purports to bifurcate the services and fees of consumer bankruptcy cases into prepetition and postpetition periods.

The UST asserts that, under the Factoring Agreement (as later amended), Castle Law sold its accounts receivables for postpetition bankruptcy services to BK Billing in exchange for payment, shortly after the filing of the case, of a discounted portion of the total attorney fee. Specifically, BK Billing advanced 75% of the postpetition fee to Castle Law. Castle Law's portion was, however, subject to a "holdback" whereby BK Billing distributed 60% of the fees to Castle Law immediately after the client account was factored and placed 15% in escrow. In turn, BK Billing collected from the debtor the total amount due.  According to the UST, the holdback permitted BK Billing to draw from the escrow for costs and expenses incurred if the debtor failed to pay.

Under the Factoring Agreement, the UST alleges, Castle Law was able to enter into "little or no money down" arrangements with clients, including the debtors in each of these cases, under which Castle Law would represent its clients both pre- and postpetition, but structure the agreements so that all or virtually all the payments were intended to compensate solely for

6

postpetition services, regardless of when the work was actually performed. According to the UST, this permitted Castle Law and BK Billing to collect payments from the clients without violating the automatic stay and discharge injunction provisions of the bankruptcy code.

***Castle Law Changes the Fee Agreement with Ms. James***

The UST alleges that, shortly after Castle Law entered into the Factoring Agreement with BK Billing in May 2017, Castle Law contacted Ms. James and offered to go ahead and file her case with no additional money down – recall, she had only paid $225 of the $1,650 due by this point – if she would agree to enter into new fee agreements. The UST alleges that the purpose of this offer was to bring her account, which had not been subject to the factoring arrangement previously, within the Factoring Agreement.

Ms. James agreed, and on July 6, 2017, Castle Law entered into a new "Attorney-Client Retainer Agreement" with Ms. James, which the UST refers to as the "Pre-Petition Contract." According to the UST, the Pre-Petition Contract replaced the Initial Contract.[10] Under this new agreement, Ms. James (again) retained Castle Law to represent her in her bankruptcy case and provided that, once the bankruptcy case was filed, Ms. James would be presented with a second retainer agreement, the "Post-Petition Contract," to pay Castle Law a flat fee of $2,175 for postpetition services. The contracts thus purported to bifurcate Castle Law's services, but, in effect, allocated all the fees to postpetition services.

The Pre-Petition Contract apparently did not address the $225 Ms. James had already paid Castle Law. The UST alleges that the fee of $2,175 was in addition to the $225. The Pre-Petition Contract also did not provide for the court's filing fee or the credit report fee. According to the UST, assuming that the $2,175 included the filing fee and credit report fee, the attorney fee portion

---

[10] The record does not disclose what fee Ms. James was charged in the Pre-Petition Contract and the Pre-Petition Contract was not provided as an exhibit.

was $1,775. When added to the $225 Ms. James had already paid, her actual attorney fee for the chapter 7 bankruptcy was thus $2,000 (exclusive of expenses), an increase of $775 (or approximately 60%) over the $1,250 originally agreed to. The UST asserts the new agreement thus shifted the full cost of BK Billing's involvement under the factoring arrangement to Ms. James.

As part of her new agreement with Castle Law, Ms. James also signed a Recurring Payment Authorization and Consent Form (the "ACH Agreement") authorizing BK Billing to automatically withdraw $85 every two weeks from Ms. James' checking account from August 11, 2017 until the entire $2,175 was to be paid in full on July 27, 2018.

### Castle Law Files a Chapter 7 Case on Ms. James' Behalf

A couple of weeks after entering the new fee arrangement with Castle Law, on July 25, 2017, Ms. James met with an associate attorney at Castle Law and executed the chapter 7 petition, which Castle Law filed on her behalf later that day. Castle Law paid the court filing fee with the petition. Even though Ms. James had initially retained Castle Law more than six months earlier, the filing was "skeletal," in that it did not include the required schedules, statements, and related documents. DK 1.[11] That same day, Castle Law also filed a "Debtor's Declaration Re: Electronic Filing" dated July 25, 2017, which bears Ms. James' signature, and a certification that the applicable Rights and Responsibilities Agreement pursuant to Local Rule 2016-1.D had been executed. DK 2, 6.

---

[11] *See* Local Rules of Procedure for the United States Bankruptcy Court, W.D. Mo. 1009-1.  Note that references to the docket in Ms. James' main bankruptcy case will be referred to as "DK"; references to the docket in the adversary proceeding will be to "ADV DK."

8

The filing of the skeletal petition triggered this court's order to show cause ("OTSC") why the case should not be dismissed unless all schedules, statements, and other documents were filed no later than August 9, 2017. DK 8.[12]

### *Ms. James Signs the Post-Petition Contract and BK Billing Pays Castle Law Under the Factoring Agreement*

The day after the court issued its OTSC, Ms. James apparently signed the Post-Petition Contract. The UST alleges that, because Ms. James' case was subject to dismissal without the filing of the schedules, she had no choice but to sign the Post-Petition Contract. The Post-Petition Contract allegedly required Ms. James to agree that the attorney fees would be nondischargeable.

The UST contends that, on or about July 27, 2017 (two days after filing Ms. James' case, and on the day Ms. James entered into the Post-Petition Contract), Castle Law uploaded to BK Billing's system a number of documents, including the ACH Agreement dated July 6, 2017; the "Notice of Bankruptcy Case Filing" dated July 25, 2017; the Post-Petition Contract dated July 27, 2017; copies of Ms. James' pay stubs; and a copy of her June 2017 bank account statement, together with a canceled check.

Four days later, BK Billing paid Castle Law $1,305 under the Factoring Agreement in connection with Ms. James' case, even though Ms. James had not paid anything to BK Billing by that time. BK Billing "held back" $326.25 as escrow under the amended BK Billing Agreement.[13] BK Billing began collecting payments from Ms. James through automatic withdrawals from her checking account under the ACH Agreement on August 11, 2017.

---

[12] The court notes that there is nothing inherently improper in filing a skeletal petition. Bankruptcy petitions are often quick-filed to prevent a foreclosure or to stop a garnishment and there is simply no time to compile the necessary information and fill out the paperwork. Moreover, schedules and statements are signed by debtors under penalty of perjury, so it is important that they be accurate. The UST asserts here, however, that since Ms. James had met with Castle Law months before the filing, the forms should have been – and perhaps were – completed prepetition.

[13] It is not clear to the court how these amounts were calculated.

9

*Castle Law Files the Omitted Schedules and Statements*

Before the OTSC deadline, Castle Law filed Ms. James' schedules and statements. DK 11. The filings included the "Disclosure of Compensation of Attorney for Debtor(s)."[14] The disclosure, certified by Defendants to be a complete disclosure of the fee arrangement, provides that Castle Law had agreed to accept $1,455 for legal services and had received $0 prior to the filing, leaving a balance due of $1,455. The Disclosure also stated that Ms. James had paid the $335 filing fee and that she was the source of the fees already paid, and to be paid. According to the UST, by this time however, Ms. James had only paid Castle Law $225, which did not even cover the $335 court filing fee already paid. The Disclosure also failed to disclose BK Billing or the Factoring Agreement as the source of any payment.

Ms. James also filed her statement of financial affairs ("SOFA") with her schedules. Question Number 16 on Ms. James' SOFA asked:

> Within 1 year before you filed for bankruptcy, did you or anyone else acting on your behalf pay or transfer any property to anyone you consulted about seeking bankruptcy or preparing a bankruptcy petition?  Include any attorneys, bankruptcy petition preparers, or credit counseling agencies for services required in your bankruptcy.

Ms. James answered that question by stating that she had paid nothing to Castle Law and again failed to disclose BK Billing. The UST alleges that these disclosures about compensation were false and misleading (although he does not place the blame at Ms. James' feet).

Along with the documents filed on August 8, Castle Law also filed a "Verification by Debtor," in which Ms. James declared under penalty of perjury that she had read the schedules and statements filed and that they were true and correct to the best of her knowledge. DK 12. The Verification bears Ms. James' signature and a hand-written date of August 8, 2017.

---

[14] Known as the Rule 2016(b) or Section 329 form.

The chapter 7 trustee conducted the meeting of creditors on August 28, 2017. DK 15.[15] The

following day, Castle Law filed an amended Disclosure of Compensation,[16] stating that it had

agreed to accept $2,000 for legal services, had been paid $0, leaving a balance due of $2,000. DK

16. As before, this Disclosure stated that Ms. James had paid the $335 court filing fee, and that

Ms. James was the source of all fees paid, and to be paid. The UST asserts this disclosure was also

incorrect and, further, that Castle Law had still not disclosed the factoring arrangement with BK

Billing.

Soon thereafter, the chapter 7 trustee issued a Report of No Distribution [DK 17], meaning,

in essence, that there were no assets to distribute to creditors. Other than the issue with the attorney

fees, Ms. James' bankruptcy case (as well as the other three cases) proceeded uneventfully and

each of the debtors ultimately received their discharge.

Meanwhile, however, the UST investigated Castle Law's fee agreements and its Factoring

Agreement with BK Billing, and ultimately filed complaints in Ms. James' and the other three

consolidated cases.

### *The UST's Allegations in the Complaint*

The UST alleges that Ms. James had actually signed the prepared schedules and statements

on August 1, 2017, but Castle Law waited a week – until just before the OTSC deadline – to file

them. The UST alleges that Castle Law post-dated the schedules and statements on August 8 to

make it appear Castle Law had done most of the work postpetition.[17]

The UST also alleges that, to prevent disclosure of the Factoring Agreement, Castle Law

made numerous misrepresentations to the court in its Disclosures of Compensation filed in the

---

[15] All four of the debtors in these cases had their meeting of creditors on August 28, 2017.
[16] Castle Law filed amended Disclosures of Compensation the day following the meeting in all four of these cases.
[17] It is not clear to the court whether the schedules and statements were actually prepared before the filing on July
25, even though they were apparently signed on August 1 and not filed until August 8.

cases, including the amount to be paid, that Ms. James was the source of the fees, and that Castle

Law had received nothing to date (except for the filing fee), whereas it had already received $1,305

from BK Billing and $225 from Ms. James before the Disclosures were filed. The UST also alleges

that, when the UST inquired about the situation, Castle Law attempted to hide the arrangement.

The UST's complaints in these cases each set forth five counts:

- Count I: Violation of 11 U.S.C. § 526(a)(2), which prohibits a "debt relief agency" such as
  Castle Law is, from making any untrue or misleading statements, or counseling or advising
  debtors or prospective debtors to make such statements, in a document filed in a bankruptcy
  case.[18]

- Count II:  Violation of § 528(a)(1), which requires Castle Law to execute a written contract
  with the debtor that explains clearly and conspicuously the services to be provided, the fees
  to be charged for such services, and the terms of payment.

- Count III:  Violations of § 329(a) and Rule 2016(b), which require debtors' attorneys to
  file statements and disclosures of fees to be paid by the debtor.

- Count IV:  Examination of Reasonableness of Fees Under § 329(b), which authorizes the
  court to order that unreasonable or excessive fees to be disgorged.

- Count V:  Imposition of Discipline or Referral to the District Court, alleging that Mr.
  Amerine violated several of the Missouri Rules of Professional Conduct ("MRPC").[19]

---

[18] 11 U.S.C. § 526(a)(2). Castle Law admits in its Answers that each of the four debtors is an "assisted person" as that
term is defined in § 101(3) of the Bankruptcy Code but denies that it is a "debt relief agency" under § 101(12A).  If
Castle Law in fact takes the position that it is not a "debt relief agency," that would be a matter for trial.
[19] In Count V, the UST alleges that Attorney Amerine violated MRPC 4-1.4, 1.7, 1.8, 3.3, and 8.4 because he allegedly
failed to advise his clients that the postpetition retainer agreement fee covered prepetition services, he had a conflict
of interest for accepting compensation through a third party assignee, and he filed disclosures of compensation and
other documents with misstatements.

12

The UST seeks varying forms of relief in addition to other general equitable relief with respect to each specific count. In Count I, the UST seeks, among other things, the imposition of an appropriate civil penalty under § 526(c)(5)(B), which expressly authorizes such civil penalties for violations of § 526 as well as an injunction. Count II requests that the court declare the debtors' contracts with Castle Law be declared void and unenforceable, and that all amounts collected under the contracts be disgorged under §§ 526(c)(1) and 105(a). Count III also requests that the fees be disgorged "as a remedial sanction" and other sanctions as may be appropriate under §§ 329 and 105(a).  Count IV likewise requests disgorgement of fees under § 329. Count V requests that this court refer Mr. Amerine's alleged violations of the MRPC to the United States District Court for the Western District of Missouri *en banc* for further proceedings.

### Discussion

The crux of Castle Law's argument for discretionary withdrawal of the reference is that the bankruptcy court lacks jurisdiction and authority to adjudicate the UST's claims. This court disagrees.

### Withdrawal of the Reference Generally; Mandatory Withdrawal Not Applicable

Federal district courts have original jurisdiction over bankruptcy cases.[20] 28 U.S.C. § 157(a) provides that a district court may refer "all cases under title 11 and any or all proceedings arising under[21] title 11 or arising in[22] or related to[23] a case under title 11" to the bankruptcy judges

---

[20] 28 U.S.C. § 1334.

[21] "Arising under" means a claim that "is created by or based on a provision of the bankruptcy code." *Frelin v. Oakwood Homes Corp*., 292 B.R. 369, 376-77 (Bankr. E.D. Ark. 2003) (citing *National City Bank v. Coopers & Lybrand*, 802 F.2d 990, 994 (8th Cir. 1986)).

[22] "Arising in" means matters that "can only be brought in a bankruptcy case" because the claim "has no existence outside of bankruptcy." *In re Ames Dept. Stores, Inc.*, 542 B.R. 121, 135 (Bankr. S.D. N.Y. 2015); *see also Frelin v. Oakwood Homes*, 292 B.R.at 377 ("A case 'arises in' a case under title 11 if it is not based on any right expressly created by the bankruptcy code but has no existence outside the bankruptcy case.").

[23] A matter is considered "related to" a bankruptcy case if it could "conceivably have an effect on the estate being administered in bankruptcy." *Specialty Mills v. Citizens State Bank*, 51 F.3d 770, 773-74 (8th Cir. 1995) (adopting the

13

for that district. The district court for the Western District of Missouri did so by order dated August 15, 1984.[24] The debtors' chapter 7 bankruptcy cases and the adversary complaints filed in them have therefore been automatically referred to the bankruptcy court.[25]

The district court's automatic reference of bankruptcy matters may be withdrawn, under either discretionary or mandatory grounds, on timely motion and for cause shown.[26] Withdrawal is mandatory if "the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce."[27] Although Castle Law asserts the bankruptcy court lacks jurisdiction to adjudicate many of the UST's claims, it does not assert that this case involves "other laws of the United States regulating organizations or activities affecting interstate commerce" or that withdrawal is mandatory. This court agrees that mandatory withdrawal is not applicable.

### Discretionary Withdrawal of the Reference

A district court has discretion to withdraw the reference for "cause shown."[28] Section 157(d) does not define "cause" for withdrawal of the reference. In considering the meaning of "cause," however, courts consider several factors:

(1) whether the claims are core or non-core;

(2) delay and costs to the parties;

(3) the efficient use of judicial resources;

---

so-called *Pacor* test derived from *Pacor, Inc. v. Higgins*, 743 F.2d 984 (3d Cir. 1984)). If a matter is a non-core, related-to matter, the bankruptcy court cannot enter final judgment without the parties' consent.
[24] *Order Regarding Reference of Bankruptcy Matters to United States Bankruptcy Judges*, available on the court's website at http://www.mow.uscourts.gov/bankruptcy/rules.
[25] For a further discussion of the differences between matters "arising in," "arising under," and "related to," see *In re Sinn*, Adv. No. 14-4051, 2014 WL 7689811 (Bankr. W.D. Mo. Oct. 7, 2014).
[26] *Eide v. Haas* (*In re H & W Motor Express Co.*), 343 B.R. 208, 212 (N.D. Iowa 2006). The motions here were timely filed since they were filed along with the answers.
[27] 28 U.S.C. § 157(d).
[28] *In re H & W Motor Express*, 343 B.R. at 213.

14

(4) the uniformity of bankruptcy administration;

(5) the prevention of forum shopping; and

(6) the presence of a jury demand.[29]

Whether the district court should withdraw the reference to the bankruptcy court is committed to the district court's sound discretion.[30] The moving party bears the burden of proof on "cause."[31]

***Defendants' Arguments***

This court finds Defendants' arguments exceedingly difficult to decipher, so difficult, in fact, that the court held a follow-up conference after the motion was fully briefed. At that conference, the court pointed out that the Defendants appeared to be conflating the terms "jurisdiction" and "authority," and offered the Defendants an opportunity to further explain their arguments in supplemental briefing. Unfortunately, the supplemental briefing has not clarified the Defendants' position, but only muddled it.

As the court understands it, Defendants concede that the complaints as pled are "core" proceedings, since the complaints allege violations of the bankruptcy code and rules and thus constitute proceedings "arising in" or "arising under" the bankruptcy code. They assert, however, that since the bankruptcy court might impose punishment for those violations, somehow the possibility of being punished transmutes those core counts into noncore ones over which the bankruptcy court then magically loses its jurisdiction and authority at the time punishment is imposed. This makes no sense.

---

[29] *Id.* at 214. *See also Strauss v. Cole*, 2017 WL 6643995 at *5-6 (W.D. Mo. Dec. 29, 2017) (Judge Nanette K. Laughrey of this district discussing discretionary withdrawal of the reference).
[30] *Id.*
[31] *Id.*

15

### The UST's Claims are Core

"Core" proceedings are statutorily defined, and include matters generally considered essential to the nature of the bankruptcy process, such as matters concerning the administration of the estate, allowance of claims, matters of dischargeability, applicability of the stay, and so on.[32] The statute contains a list of examples of core proceedings, but the list of examples is unlimited. As the Eighth Circuit has explained, core proceedings are those which arise only in bankruptcy or involve a right created by federal bankruptcy law.[33]

Notwithstanding that the UST's complaints allege violations of the bankruptcy code and rules – and would therefore be indisputably core – the Defendants maintain that the nature of the punishment for those violations divests the complaints of "coreness" as of the time of any judgment. Citing *International Union, United Mine Workers of America v. Bagwell*,[34] a contempt case, Defendants contend that the UST is seeking to punish them criminally for their past acts, as opposed to holding them in civil contempt. Leaving aside the fact that coreness – like jurisdiction – is fixed when the complaint is filed and does not later evaporate, Defendants' argument misses the point.

The UST is not seeking to hold the Defendants in either civil or criminal contempt. The fact that certain sections of the bankruptcy code provide for civil penalties without giving the violator an opportunity to purge the violation does not mean the penalty is criminal in nature. Indeed, as the UST points out, the Honorable M. Douglas Harpool so held in a case in which the UST similarly asserted violations of §§ 526, 528, 329, and Rule 2016.[35]

---

[32] *See* 28 U .S.C. § 157(b)(2)(A)-(P); *In re Sinn*, 2014 WL 7689811 (Bankr. W.D. Mo. Oct. 7, 2014).

[33] *In re Sinn*, 2014 WL 7689811 (Bankr. W.D. Mo. Oct. 7, 2014) at *4 (citing *Specialty Mills, Inc. v. Citizens State Bank*, 51 F.3d 770, 773 (8th Cir.1995)).

[34] 114 S.Ct. 2552, 2558 (1994).

[35] *United States Trustee v. Bisges*, Case No. 15-cv-4194-MDH, ECF No. 18 at 6 (W.D. Mo. April 4, 2016) ("Defendant also argues Plaintiff is seeking criminal penalties and that the bankruptcy court cannot hear such claims.  However, the Court's review of the Complaint does not find this to be true.  The record before the Court does not reflect that

16

Second, the United States Supreme Court has affirmed that courts have inherent authority to sanction. In *Chambers v. NASCO, Inc.*,[36] the Supreme Court stated unequivocally: "Federal courts have the inherent power to manage their own proceedings and to control the conduct of those who appear before them." *Chambers* also makes clear that federal courts have discretion to fashion an appropriate remedy when employing their inherent power to punish conduct which abuses the judicial process.[37] The Eighth Circuit has expressly held that bankruptcy courts as federal courts also have such inherent power, and that the power to sanction includes the power to discipline.[38]

Indeed, the Eighth Circuit unfortunately has had more than a few appeals deriving from bankruptcy court sanctions orders, and in not one has the Eighth Circuit ever held that bankruptcy courts lack jurisdiction or authority to sanction bankruptcy attorneys, including sanctions that

---

any criminal charges have been brought against Defendant. Rather, the Plaintiff is seeking damages, fines and arguably penalties, pursuant to the relevant [statutes] governing Mr. Bisges' conduct before the bankruptcy court.").

[36] 501 U.S. 32, 33, 111 S.Ct. 2123, 2126 (1991). *See also Law v. Siegel*, 571 U.S. 415, 134 S.Ct. 1188, 1194, 188 L.Ed.2d 146 (2014) (bankruptcy courts "possess 'inherent power ... to sanction abusive litigation practices.'") (*quoting Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 375-76, 127 S.Ct. 1105, 166 L.Ed.2d 956 (2007)).

[37] *Id.*

[38] *In re Steward*, 828 F.3d 672, 686–87 (8th Cir. 2016) ("Bankruptcy courts have the authority to sanction persons appearing before them, and this authority includes the right to 'control admission to [their] bar.'") (citing *In re Burnett*, 450 B.R. 116, 132 (Bankr. E.D. Ark. 2011) (quoting *Chambers v. NASCO, Inc.,* 501 U.S. 32, 43, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991)); *Law v. Siegel*, 571 U.S. 415, 134 S.Ct. 1188, 1194, 188 L.Ed.2d 146 (2014); *In re Clark,* 223 F.3d 859, 864 (8th Cir. 2000)).

17

involve discipline.[39] And, it goes without saying that if the bankruptcy court has the power to sanction then it must perforce have jurisdiction to do so.[40]

The Defendants next assert that at least some of the claims made here belong to the debtors, and not to the UST. It is true that § 526(c)(1) provides that only a debtor may *enforce* an attorney-client agreement that violates the code. But that is not what the UST is seeking to do here. Rather, § 526(c)(5)(B) specifically authorizes the UST to bring a claim against an attorney for violations of § 526. And, § 307 of the bankruptcy code expressly confers standing on the UST to bring violations by attorneys to the court's attention.[41] Indeed, in this court's view, the UST has a duty to do so.

The Defendants' argument – taken to its logical extreme – is that bankruptcy courts have no authority to regulate attorneys who appear before them or to penalize them for improper conduct. This court has already observed that the bankruptcy code is unique in its statutorily required court scrutiny of the attorney-client relationship. Congress expressly conferred standing

---

[39] *See In re Ragar*, 3 F.3d 1174, 1178-79 (8th Cir. 1993) (holding that the bankruptcy court's criminal contempt order was within § 105(a)'s clear delegation of authority and that the use of a criminal or civil contempt power may be necessary or appropriate to enforce a violated order); *In re Mahendra*, 131 F.3d 750 (8th Cir. 1997) (affirming imposition of sanctions under Rule 9011 based on a conflict of interest); *In re Clark*, 223 F.3d 859, 864 (8th Cir. 2000) (holding that § 105 gives bankruptcy courts broad power to implement provisions of the bankruptcy code and to prevent abuse of the bankruptcy process, which includes the power to sanction for abuses of process); *In re Kujawa*, 270 F.3d 578 (8th Cir. 2001) (affirming award of sanctions under Rule 9011 and inherent authority); *In re Smith*, 212 Fed.Appx. 577, 578 (8th Cir. 2006) (holding that the bankruptcy court had the authority under § 105 to sanction an attorney, regardless of whether the order was characterized as a sanctions order or a contempt order); *Isaacson v. Manty*, 721 F.3d 533 (8th Cir. 2013) (affirming bankruptcy court's punitive sanctions for criminal contempt); *In re Young*, 789 F.3d 872 (8th Cir. 2015) (affirming sanctions under Rule 9011); *In re Reed*, 888 F.3d 930 (8th Cir. 2018) (holding that bankruptcy courts have constitutional authority to impose contempt sanctions on an attorney).

[40] *See also In re Tabor*, 583 B.R. 155, 175 (Bankr. N.D. Ill. 2018) (holding that bankruptcy courts have authority to oversee and correct for attorney conduct under *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991); bankruptcy courts have, essentially, four types of authority that might be invoked: "(1) the power to regulate behavior before it inherent in all courts; (2) the direct, specific authority of a statute or rule; (3) the ability to regulate the practice of the federal bar, as delegated to the court by the United States District Court for this District; and (4) the authority afforded specifically to the bankruptcy courts under section 105 of the Bankruptcy Code.").

[41] 11 U.S.C. § 307 ("The United States trustee may raise and may appear and be heard on any issue in any case or proceeding under this title but may not file a plan pursuant to section 1121(c) of this title."). *See also* 28 U.S.C. § 586 (specifying the duties of the UST).

18

on the UST to bring these violations to the court's attention in part because unsophisticated debtors may not know their attorneys are taking advantage of them.[42]

In sum, this court recommends that the district court find all the UST's claims are core, and that the bankruptcy court has both jurisdiction and authority to determine them and enter final judgment. This factor weighs heavily against withdrawal of the reference.

### The Other Factors Relating to Cause for Withdrawal of the Reference

The second and third factors – delay and costs to the parties and the efficient use of judicial resources – weigh in favor of denial of the motions. This court is intimately familiar with both the procedural history and the alleged facts of these cases, in addition to being deemed an expert in substantive bankruptcy law and procedure.  To start over now before another court would only further delay resolution of this matter and could only further add to the costs.

The remaining factors – uniformity of bankruptcy administration, the prevention of forum shopping, and the presence of a jury demand – also support denial of the withdrawal motions. The Defendants have not demanded a jury trial. And, bankruptcy courts certainly have an *interest* in ensuring that the bankruptcy code and rules are uniformly applied to bankruptcy attorneys, and that sanctions, including discipline, be imposed where appropriate. This bankruptcy judge also has *experience* in doing so.[43] And given that experience, a reasonable judge could conclude that the Defendants' motivation here is to avoid having a bankruptcy judge decide whether they violated bankruptcy law and rules and in so doing, committed professional misconduct.

---

[42] "The U.S. Trustees were given important oversight and watchdog responsibilities to ensure honesty and fairness in the administration of bankruptcy cases and to prevent and ferret out fraud.  Given the law enforcement orientation of the Department of Justice, it was especially beneficial to the accomplishment of these tasks to house the [U.S. Trustee] Pilot Program in the Department."  H.R. Rep. 99-764 found at 1986 U.S.C.C.A.N. 5227, 5231 (Aug. 7, 1986).

[43] *See In re Small*, Case No. 18-40362, 2018 WL 2938517 (Bankr. W.D. Mo. June 7, 2018) (ordering disgorgement of bankruptcy attorney fees); *In re Pigg*, Case No. 14-50266, 2015 WL 7424886 (Bankr. W.D. Mo. Nov. 20, 2015) (same; referral for discipline).

## CONCLUSION

The bankruptcy court respectfully recommends: (1) that the district court determine that the bankruptcy court has jurisdiction over each of the counts pled in the UST's complaints; (2) that the district court determine that all counts of the complaints are core and that therefore the bankruptcy court has statutory  authority to hear and determine the UST's complaints and to enter final judgments on all counts; (3) that Defendants' other arguments not addressed herein be rejected as having no legal merit; and (4) that the district court deny the Defendants' motions to withdraw reference in these four cases.

/s/  Cynthia A. Norton
Chief Judge Cynthia A. Norton

Dated: <u>November 28, 2018</u>